## Case No. 3,389.

### CRESSON v. CRESSON.

[6 Am. Law Reg. 42; 5 Pa. Law J. Rep. 431.]

Circuit Court, E. D. Pennsylvania. May Term, 1857.

#### CONSTRUCTION OF WILL—CHARITABLE USE.

1. Testator, domiciled at Philadelphia, devised certain lands in Pennsylvania to twelve trustees "in trust for the formation and support of a home for the aged, infirm or invalid gentlemen and merchants, where they may enjoy the comforts of an asylum—not eleemosynary, but, as far as may be, by the addition of their own means, and by reference to the Prytaneum of ancient Athens, an honorable home—with the hope that it may be perpetuated and enlarged by the bequests of its grateful inmates, until it shall become worthy of the city of Penn, and a blessing to a class whose wants have hitherto been overlooked; leaving to my trustees full power to conduct and carry out this institution on the best possible plan, and to provide for its permanent usefulness in or near my native city."

2. On bill filed and claim made by the residuary devisees under the will, and by the heirs at law of the testator, to have the devise declared invalid, inoperative and void: *Held*, that the devise was good under the laws of Pennsylvania, and was valid as a charitable use.

3. Whether independent of the charitable character of the devise it could be sustained as a trust, quaere?

St. Geo. T. Campbell, Junkin, Parsons & Bell, for residuary devisees and heirs at law.

E. K. Price and J. B. Townsend, for trustees.

KANE, District Judge. The testator, Mr. Elliott Cresson, a resident citizen of Philadelphia, made the following provision by his last will and testament: "I give and bequeath to my friends, Joseph R. Ingersoll, Eli K. Price, John W. Claghorn, E. F. Rivinus, Frederick Fraley, William Parker Foulke, Thomas S. Mitchell, Dr. Kirkbride, Joseph Harrison, and my executors hereinafter named, my lands in Clinton county, Pennsylvania, or the proceeds thereof, if sold during my lifetime, in trust for the foundation and support of a home for aged, infirm, or invalid gentlemen and merchants, where they may enjoy the comforts of an asylum,—not eleemosynary,—but, as far as may be, by the addition of their own means, and by reference to the Prytaneum of ancient Athens, an honorable home,—with the hope that it may be perpetuated and enlarged by the bequests of its grateful inmates, until it shall become worthy of the city of Penn, and a blessing to a class whose wants have hitherto been overlooked, leaving to my said trustee full power to conduct and carry out this institution on the best possible plan, and to provide for its permanent usefulness in or near my native city."

The legal validity of this provision is the only subject of controversy in the present suit. I may be misled, perhaps, by a desire to establish such a trust as I think this was intended to be; but the question has not seemed to me at any time a doubtful one under the established law of Pennsylvania. It is by reference to this law that it must be considered and decided,—a law, in some respects, more liberal and wiser than that of England,—though not dissonant from it in principle,—the law, under which charities have taken root and borne fruit among us beyond any example to be found in those states that have yielded to a less enlightened policy. Yet, I would by no means be understood as implying, that such a charity as this would not commend itself to the guardianship of the English chancery. There is not, so far as I have read, and never has been, an objection, statutory or judicial, to the recognition of a purely charitable use, where the donee was not a corporation. The inhibition in Magna Charta referred only to lands given to religious houses; and so did the statutes that followed it. There never was a time, as both the argument and the judgment in Vidal v. Mayor, etc., 2 How. [43 U. S.] 128, justify me in affirming, when a grant or a devise to an individual for an adequately expressed use, not superstitious, was without protection in England. Moreover, in determining what uses were adequately expressed, the English chancellors have been ingenious even to astuteness on the side of charity. The cases that were cited in the discussion before us show this sufficiently, but there are a few others equally if not more striking. Among them is that of Townsend v. Carus, 3 Hare, 257, where the trust was "to pay, divide, dispose unto and for the benefit or advancement of such socie-

ties, subscriptions, or purposes, having regard to the glory of God in the spiritual welfare of his creatures, as the trustees in their discretion shall see fit." Another, not less marked, is that of Whicker v. Hume (decided in 1852) 10 Eng. Law & Eq. 217, where a bequest was sustained upon trust "to apply and appropriate in such manner as the trustees in their absolute and uncontrolled discretion think proper and expedient for the benefit and advancement and propagation of education and learning in every part of the world." This reminds one of the language of Mr. Smithson, "an establishment for the increase and diffusion of knowledge among men;" but it is not the broadest of the cases in the modern books. I think the bequest in Nightingale v. Gouldbourn, 2 Phill. 594, to the chancellor of the exchequer, "to be appropriated to the benefit and advantage of my beloved country, Great Britain," which was sustained as a charity, may claim a still greater latitude of application; and the trust for "the increase and encouragement of good servants," (public, it might be argued, as well as domestic,) devolves an equally large discretion on the trustees. Loscombe v. Wintringham, 13 Beav. 87. But the case which struck me most forcibly, as it is the latest, is one decided by the master of the rolls in November last, to which I have been guided by the learned annotator of the forthcoming edition of Hill on Trustees. It is that of University of London v. Yarrow, 26 L. J. Ch. 70. The bequest there was for "founding, establishing, and upholding an institution for investigating, studying, and, without charge beyond immediate expenses, endeavoring to cure maladies, distempers and injuries, any quadrupeds or birds, useful to man, may be found subject to;" and to pay a salary to a "superintendent or professor of the institution and its business," who shall "annually give on the business of the said institution at least five lectures in English and free to the public:"—a sort of barnyard sanitarium, held valid as a charity under the statute of Elizabeth.

So much as to the law of England. But the immediate question is as to our own. And here we may begin by remarking, that however our courts may have at any time differed in their theories as to charitable uses, their controlling aim throughout all the decisions has been to guard against the failure of a charity. We know now, that the statute of 43 Elizabeth was only remedial, as indeed its words import, and that the policy it sought to vindicate was part and parcel of the more ancient English law. But when Pennsylvania was settled, this truth had not yet been developed by the researches of legal antiquaries; and more than a century later, Lord Loughborough, commenting on Porter's Case in 1 Coke, 16, doubted whether his court could have established a charity before the statute. Attorney General v. Bowles, 2 Ves. Sr. 546. The men who founded this commonwealth in 1682 were probably no better read in the mysteries of jurisprudence than the lawyers they left in the old country; but they brought with them principles of civil polity, matured in suffering, that determined easily and wisely what was that law of England which approved itself to their circumstances. They founded no church establishment, for they held that Almighty God is the sovereign lord of conscience; and they repudiated the whole absurdity of superstitious dissent,—if for no better reason,—because it had been the offensive stigma of their own religious opinions, and they had fled to the wilderness to escape from it. They instituted no poor-rates; but they knew that the poor must be always with them, and their sectarian usages had taught them to distinguish between the silent beneficence of a brotherhood and the ostentatious, degrading charity of an almshouse. It is the questionable wisdom of much later times that rejoices in disseminating corporate immunities. William Penn's associates held their church lands, and endowed their schools, and managed their charities, without them; and so did their successors for four-fifths of a century. How could the doctrine of charitable uses, the exceptional corrective of a system that sought to regulate conscience by law, and that denounced ecclesiastical endowments, find a place in the common law of such a people?

We incline therefore to the opinion so ably enforced by Judge Baldwin in the case of Zane's Will. 1 Brightly, N. P. 350, note, that as there never was a superstitious use in Pennsylvania, to be extruded by the law, so there was no need of the devise of a charitable use to save a trust which sound policy commended. But, whether so or not, the case of Witman v. Lex, 17 Serg. & R. 93, has placed our Pennsylvania charities on a perfectly safe basis. "It is sufficient to say," in the words of Chief Justice Gibson, "that it is immaterial whether the person to take be in esse or not; or whether the legatee were at the time of the bequest a corporation capable of taking or not; or how uncertain the objects may be, provided there be a discretionary power vested anywhere over the application of the testator's bounty to those objects; or whether the corporate designation has been mistaken; if the intention sufficiently appears in the bequest, it is to be held valid." "We certainly," he adds, in Pickering v. Shotwell, 10 Barr [10 Pa. St.] 25, "will not let a charitable bequest fail, where there is a discretion or an option given to trustee; and if he cannot apply it to all the contemplated objects, it will be sufficient if he can apply it to any of them; nor need the power to act at discretion be expressly given, if it can be implied from the nature of the trust."

Taking this then as the law of the state, let us turn to the disposition in Mr. Cresson's will. It is in trust, as we read it, with scarce a change except of punctuation, "for the

foundation and support of a home for aged, infirm or invalid gentlemen and merchants, where they may enjoy the comforts of an asylum;" this asylum not to be "eleemosynary," but sustained by the inmates, "as far as may be, by the addition of their own means;" and its character, "by reference to the Prytaneum of ancient Athens," that of "an honorable home." Words follow expressive of the testator's hope that the institution may prosper and be enlarged by endowments from its inmates; and then the trustees are fully empowered to "conduct and carry it out on the best possible plan." It is said this is equivocal—first, as to the beneficiaries, and second, as to the scheme of beneficence. It is asked, who is a gentleman and who a merchant? I do not propose to answer the question ex cathedrâ. There is no language so precise, that a judge can safely pass upon its import, till time and contingency present the occasion for interpreting it. Who are "the poor"? Witman v. Lex [supra], and other cases innumerable. Who, "the blind, the lame"? Com. v. Elliott [case unreported]. Who, the "orphans"? Vidal v. Mayor, etc., [supra]. No doubt these are adequate designations in a charitable bequest. Yet "poverty" is only a relative term; the absolutely blind and lame are understood not to be within the provision of the Wills legacy, but only those whose infirmity may be susceptible of cure; and the Girard College was organized for several years before its officers, though assisted by all the critics, could determine which one of three definitions was the appropriate one to be given to Mr. Girard's language. I am not aware that either of these bequests, abundantly litigated as they were in their day, was ever assailed for uncertainty of its terms. "Gentleman" and "merchant" may be words to which the different lines of a dictionary attach different meanings; as they do indeed, to almost all the words of our language; but they are words defined—good English words; and when occasion requires, it may be hoped that the trustees or a court will be able to understand them. It is not enough to impeach a charitable use, or any use whatever, that men are not undivided as to the meaning of its phrases. How often are our courts occupied in the interpretation of wills of all sorts, and how often does a revisory tribunal instruct them that their interpretation has been wrong!

Is there a fatal ambiguity in the scheme of beneficence, the nature of the charity? Let us look at the language of the trust, referring ourselves, step by step, to the standards of lexicography. It proposes to establish "a home," a dwelling place.—not "eleesmosynary," not living upon alms, not depending upon charity.—for the inmates are to contribute from "their private means;" and it is to be accounted "an honorable home," admission to it being "a token of honor," by analogous reference to the Prytaneum of Athens; "in which the liberty of eating was one of the highest marks of honor." See Johnson's Dictionary, and the Encyclopaedia Americana, tit. "Prytaneum." The persons to be admitted are "gentlemen" and "merchants." The latter of these terms has been defined judicially and by statute, over and over again, as every one conversant with the bankrupt law knows. Whether the same definition is the appropriate one in this case, may be gravely doubted; but it is enough for our purpose, that, in the absence of a better, it ascertains for us who may be the beneficiaries under Mr. Cresson's will. A "gentleman," according to Dr. Johnson, is 1st, "a man of birth, of extraction, but not noble," in which sense the term does not belong to the language of our country; but 2nd, it also describes "a man raised above the vulgar by his character or post,"—the very man, in this sense, for whom all would solicit an honorable home. And, finally, the inmates of this "asylum" or place of retreat, are to be "aged, infirm, or invalid," old or feeble, or disabled by sickness. I have gone through all the words, with the aid of Johnson's quarto. The interpretation they suggest has struck me from the first as the natural and obvious intent of the testator. It is easy to travesty his meaning; to define a gentleman as one almost noble by birthright, a merchant as an importer of foreign goods, or a dealer in tape and pins,—and to laugh at an American Prytaneum, as a place where laws are to be digested or wheat stored. And it might be ably argued, that the institution could not be a charity, because it is described as "not eleemosynary."

But by what right should we so negative the objects of the bequest? Our law books may tell us that "eleemosynary" is contradistinguished to "civil," and that it imports something "constituted for the perpetual distribution of the alms or bounty of the founder" (2 Kent, Comm. 274),—a definition, by the way, that invites many qualifications to make it applicable to the very law it purports to illustrate. But Mr. Cresson was not a lawyer; he no doubt thought that he had defined his own meaning of the term, when he said that his inmates should contribute, if practicable, something towards their own support; for he may have reasoned, that a man who ministers to his wants from his own means, and is looked to as one who may endow the home in which he is living, cannot properly be said to be "living upon alms" or entirely "dependent on charity," which, according to Dr. Johnson, is the characteristic of "eleemosynary" life.

It would hardly be argued, that a foundation, such as we have supposed was within this testator's view, is not in law and in fact a charity. It would be against the spirit of the age to withhold from it this title, simply because the inmates were expected to help the institution that helped them, or because the just sensibilities of the founder had taken

pains to distinguish it from a poorhouse. It would be to rule out all our best charities from the category, our hospitals, colleges and churches among the rest. It is the beautiful characteristic of our Christian charities, that they do not wait for penury and pauperism to invoke their benevolence. They know that in our country absolute destitution is the almost certain badge of profligacy; and they seek to maintain even among the poorest, the honest pride which revolts at the idea of a confessed dependence upon alms. The religious society to which Mr. Cresson belonged has always been remarkable for the cautious secrecy with which it makes provision for its poor. I have never heard of a Quaker pauper; and I believe there are very few, even among those who contribute most largely to the liberal assessments of the sect, who know to what individuals or in what measure their charity is dispensed. I believe, too, it is the fact, that their beneficiaries, except the very infirm, do something or appear to do something towards their own maintenance.

We have considered the case thus far, as presenting the question of a charitable use. It was easiest so to consider it. But the court is not to be understood as expressing a formed opinion that the devise might not be supported upon the basis of an ordinary trust. The donees are designated by name; they are competent to take and hold, and their estate is defined; and the cestuy que trusts, the character and extent of their several interests, and the circumstances and manner in which the fund is to be applied to their benefit, might seem adequately set out by reference to the discretion vested in the trustees; "id certum quod certum reddi potest." The leading object of the trust ascertained; they have "full power to conduct and carry out the institution on the best possible plan, and to provide for its permanent usefulness." Meanwhile, as has been intimated already, this court does not undertake to define for them the terms of Mr. Cresson's charity. It is enough that we see how it can be established without violence to his words. We need not transmute a Roman Catholic priest into the congregation before which he officiates, nor masses for the dead into an easement for the living, as was done in McGirr v. Aaron, 1 Pen & W. 49; nor are we called on to explore for a general intent, more lawful than the particular intent that was in the view of the testator. We find nothing unlawful in the objects of this will, no ambiguity as to the trustees who are to take, no want of competency in them to hold and administer, no embarrassing doubt as to the class of beneficiaries or the character of the bounty. If ever we shall be called on by the trustees to advise them, or by some third party to control them, it will be time enough for us to revise our present understanding of the words of the trust. For the present, we need only say, in the language of Chief Justice Taney (Fontaine v. Ravenel, 17 How. [17 U. S.] 396), that we see nothing in "the object of this bequest so indefinite or so vaguely described, that it could not be supported as an ordinary trust;" but we do find "a bequest to persons capable of taking, and beneficiaries under the devise sufficiently certain and defined to be made the recipients of such a gift,"—which therefore "a court of chancery, in the exercise of its regular and inherent jurisdiction in relation to trusts, would establish and protect, even if the objects thereof were somewhat vague in their character, and although such devise contained a charity." Per Daniel, J., Id. 397.

PER CURIAM. The bill must be dismissed.